Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on Behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner-Appellee,

and

International Union of Electrical, Radio and Machine Workers, AFL–CIO, Intervenor,

v.

GENERAL ELECTRIC COMPANY, Respondent-Appellant.

No. 476, Docket 30752.

United States Court of Appeals Second Circuit.

Argued Sept. 7, 1966.

Decided Sept. 8, 1966.

David L. Benetar, New York City, (Thomas F. Hilbert, Jr., Herbert D. Schwartzman, Richard P. Lawlor, New York City, on the brief), for respondent-appellant.

Julius G. Serot, Asst. Gen. Counsel (Arnold Ordman, Gen. Counsel; Dominick L. Manoli, Associate Gen. Counsel, on the brief), for petitioner-appellee.

Ruth Weyand, Washington, D. C. (Irving Abramson, New York City, on the brief), for intervenor.

Gerard D. Reilly, Winthrop A. Johns, Lawrence T. Zimmerman, Washington, D. C., for Chamber of Commerce of United States and National Ass'n of Manufacturers of United States, amici curiae.

James W. Hunt, Washington, D. C., for Chamber of Commerce of United States, amicus curiae.

Lambert H. Miller, Washington, D. C., for the National Ass'n of Manufacturers of United States of America, amicus curiae.

Before LUMBARD, Chief Judge, and MOORE and KAUFMAN, Circuit Judges.

KAUFMAN, Circuit Judge:

The General Electric Company (GE) appeals from Judge Frankel's order granting a preliminary injunction under section 10(j) of the National Labor Relations Act, 29 U.S.C. § 160(j). The basic facts in the case are not in dispute and are set out in detail in the District Judge's opinion. 257 F.Supp. 690 (1966). Briefly, the General Electric Company has for years conducted separate collective bargaining negotiations with the over eighty labor unions representing its employees. For the most part these negotiations have been held at the local plant level, although nationwide bargaining has been conducted with three unions of

which the International Union of Electrical, Radio and Machine Workers, AFL-CIO (IUE) is the largest. In the past IUE has elected a General Electric Conference Board, which in turn elected a Negotiating Committee to bargain with GE. In 1965 the AFL-CIO formed a Committee on Collective Bargaining consisting of several unions whch bargain with GE. The Committee's avowed purpose was to evolve a set of national goals and to adopt a "coordinated approach" to the 1966 round of collective bargaining negotiations. A Steering Committee of the Committee on Collective Bargaining was formed, and beginning in November 1965 it attempted to meet with the company to discuss various contract issues. The company consistently refused to meet with or recognize the Steering Committee. In April the IUE Negotiating Committee in a letter to GE stated that it would no longer pursue its request for joint negotiations, and suggested a meeting with the company to discuss preliminary matters concerning the negotiation of a new agreement to replace the one due to expire in October 1966. GE agreed to meet on May 4. The meeting, however, was short-lived. When GE discovered that seven men on the Negotiating Committee were affiliated with other unions represented on the Steering Committee it refused to commence contract talks and left the conference room.[1] Within a few days, both GE and the IUE filed unfair labor practice charges with the Board. Thereafter, the Regional Director of the Board issued a complaint that GE was engaging in an unfair labor practice and also, pursuant to section 10(j) of the Act, sought an injunction restraining the company from refusing to meet with the IUE's Negotiating Committee. After four days of hearings, Judge Frankel, sitting specially to hear the case, ordered a temporary injunction pending final disposition of the Board's complaint. His order, in part, restrained GE from "failing or refusing to meet, confer and bargain collectively in good faith with * *

(IUE) * * * by declining to meet with the selected representatives of IUE * * * because of the presence of any representations of other unions from IUE * * * [has] invited to attend for the purpose of participating in the discussion and advising or consulting * * *."

It should be noted explicitly at the outset that with our disposition of this case today we are not passing on the basic controversy between GE and the IUE which Judge Frankel correctly characterized as "the extent of IUE's right to designate such additional, non-voting members of its Negotiating Committee—or, conversely, of the Company's right to hold such designees unacceptable or impermissible." The only issue which we decide today is the propriety of the section 10(j) temporary injunction issued against the General Electric Company.

It is black-letter law that the issuance of an injunction is an extraordinary remedy indeed. This is especially true in the labor field where Congress by the Norris-LaGuardia Act deprived the federal courts of jurisdiction to issue injunctions in labor disputes. One exception to this almost blanket prohibition was carved out by Congress in section 10(j) of the National Labor Relations Act empowering the Board to seek in the appropriate case a temporary injunction in the district court when a complaint charging an unfair labor practice had been issued and was pending before the Board. This section in no way changed the extraordinary nature of the injunctive remedy. Nor did it change the basic purpose of the NLRA which envisaged a system in which the Board would, in the first instance, consider and decide the issues arising under the Act and pending before it, subject to later review by the Courts of Appeals. The Board, generally, has properly restricted itself to seeking injunctions only in cases of extraordinary circumstances, exercising its power "not as a broad sword, but as a scalpel, ever mindful of the dangers

[1]. Some of the seven were wearing lapel buttons reflecting their membership in other unions.

inherent in conducting labor management relations by way of injunction."[2] The courts have generally issued section 10(j) injunctions only to preserve the status quo while the parties are awaiting the resolution of their basic dispute by the Board.[3]

■ We are not convinced that the facts in the present case reveal those special circumstances which must be present before a court will intervene and issue an injunction prior to the Board's hearing and decision. The Board has not demonstrated that an injunction is necessary to preserve the status quo or to prevent any irreparable harm. Moreover, the basic legal question underlying its conduct—the very same question presented in the American Radiator case, 155 NLRB No. 69 (1965) in which the Board did not see fit to seek an injunction—is a difficult one to resolve and one which no court has considered. It would be more in keeping with the scheme intended by Congress to have this case, particularly because of its unusual characteristics, follow the path of Board hearing and decision on the unfair labor practice charges, rather than to shortcircuit the established administrative design. The Board cannot abdicate one of the prime purposes for which it was created and thus deprive the Court of the expertise which would be available to it in reviewing the Board's holding in an enforcement proceeding. In short, this Court's decision on the ultimate proposition of law will be better based after the Board has applied its fund of knowledge to the problems involved. Indeed, this was the Congressional plan.

Nor are we moved to affirm the grant of an injunction because the Board's procedures may be slow and tortuous. We note that Judge Frankel devoted four days to the hearing in this case and held sessions during the summer months. His scholarly opinion with footnotes exceeded fifty pages. Thus, the testimony he was required to hear and the findings of fact he was compelled to make should more appropriately have been made in the first instance by the NLRB. This Court, moreover, convened an emergency panel during its summer recess to hear the appeal. The refusal of GE to proceed with the meeting occurred on May 4 and unfair labor practice charges, as we have already indicated, were filed within a few days. The controversy we are told involved important issues of labor law, many unions, and hundreds of thousands of workers engaged in this nation's defense effort. It is difficult to imagine a case that presented more vividly the need for prompt action by the Labor Board. For reasons that escape us, the Board decided not to utilize with dispatch its adjudicatory machinery but to proceed instead on a course at cross purposes with that envisaged by Congress in the National Labor Relations Act.

We, therefore, reverse and vacate the temporary injunction with the caveat, as noted before, that we are not passing on the merits of the controversy for we believe this can and should be done promptly by the Board in the first instance. And, our review of the Board's decision will be accelerated upon application by any of the parties.

2. Statement by Frank W. McCulloch, Chairman of the National Labor Relations Board, in an address, The NLRB in Action, before the Eighth Annual Joint Industrial Relations Conference, Michigan State University, April 19, 1962.

3. See, e. g., Fusco for and on Behalf of N. L. R. B. v. Richard W. Kaase Baking Co., 205 F.Supp. 465, 477 (N.D.Ohio

1962). The legislative history of section 10(j) indicates that it was added to the Act to enable the Board to restore or preserve the status quo while it is acting upon an unfair labor practice charge. Senate Report No. 105 on S. 1126, Legislative History of the Labor Management Relations Act, 1947, vol. 1, p. 433.